**AFFIRM; and Opinion Filed February 6, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-16-00633-CV

**WASH TECHNOLOGIES OF AMERICA CORPORATION AND JON K. BANGASH,**
**Appellants**
**V.**
**JOHN T. PAPPAS, Appellee**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-16090**

## MEMORANDUM OPINION

Before Justices Francis, Evans, and Boatright
Opinion by Justice Francis

Wash Technologies of America Corp. and Jon K. Bangash appeal the trial court's judgment, rendered on a jury verdict, awarding John T. Pappas actual and punitive damages and attorney's fees on his statutory fraud claim against them. On appeal, appellants challenge the jury's finding they committed fraud, the failure to find Pappas committed fraud, the trial court's failure to submit certain questions and instructions, the award of actual damages and attorney's fees, and pretrial summary judgment rulings. For reasons set out below, we overrule all issues and affirm the trial court's judgment.

Pappas and Bangash went into the car wash business together, but their relationship fell apart within six months. After Bangash ordered Pappas not to return to the car wash properties, Pappas sued for several causes of action, including breach of contract and fraud in connection with

a stock transaction. Bangash counterclaimed for breach of contract, common law fraud, and breach of a fiduciary duty. Claims and portions of claims were disposed of by summary judgment and directed verdict, leaving to the jury the issues of Bangash's and Wash Tech's alleged breach of an oral agreement and statutory fraud and Pappas's alleged fraud against Wash Tech.

At trial, Pappas testified he operated Wash Masters, a car wash in Irving that serviced about 9,000 to 10,000 cars each month and grossed about $2.2 million annually. Bangash, who had owned only drive-through tunnel car washes, became a frequent customer and was impressed with the operation. He and Pappas began discussing the possibility of going into business together with Bangash being the "finance guy" and Pappas being the "car wash guy."

Bangash first asked Pappas if he would be interested in running a car wash he owned in North Richland Hills. Pappas evaluated the property and declined. Bangash then proposed a location on Northwest Highway (the Dallas car wash) that was for sale. Pappas evaluated the property and said he told Bangash it would need "substantial improvements" to be profitable, including upgrades to the tunnel and vacuum systems. The tunnel upgrade alone was estimated at $250,000.

Bangash formed Wash Technologies and, through it, purchased the Dallas car wash on June 3, 2011. He offered Pappas a Management Agreement giving Pappas a 20% ownership interest in the company to manage, supervise, and operate the car wash. Pappas signed the Management Agreement on June 13 but not until Bangash agreed to making the suggested repairs to the property. Under the agreement, Pappas had no financial obligations; rather, Bangash was to provide funds for the uninterrupted and efficient operations and maintenance of the facility. Pappas believed Bangash selected him to enter the Management Agreement because he was impressed with Pappas's Irving car wash and wanted to duplicate its success. He said he had no

discussions with Bangash about other car washes he ran but shared as much information about Wash Masters as he could so that Bangash would understand "what the business was about."

During this same period, Pappas was presented with an opportunity to purchase from Southwest Securities, FSB, a $3.2 million promissory note on a car wash and convenience store/gas station in Plano. The note was secured by the property, which was appraised at $2.5 million, and the personal guaranty of Steve Perkins, a former partner of Pappas's. The property had been posted for foreclosure, but the Bank preferred to sell the note to a third party who would assume the Bank's position

Pappas negotiated a cash purchase price of $1.65 million and the right to acquire the note. He approached Bangash about the deal. The two agreed Pappas would assign his right to purchase the note to Wash Tech in exchange for an additional 30 percent ownership interest in the company, which would make him a 50% owner. In addition, Bangash agreed to fund $500,000 of the purchase price and cover any shortfalls or cash flow needs. Bangash provided the bank with a financing statement showing he had $556,000 in cash and $20.7 million in assets.

Pappas was unable to come up with the money for an all-cash deal, and Southwest Securities agreed to finance $1.15 million of the purchase price with a $500,000 down payment. But just before closing, Pappas said Bangash told him he could contribute only $200,000. Pappas, who had $40,000 of his own money invested in the deal, found the remaining money from family and friends. Pappas assigned his right to acquire the property to Wash Tech, and the transaction closed on June 30. Days later, Wash Tech foreclosed on the note and took possession of the property.

At this point, Pappas was operating both car washes. At the Dallas wash, he reconstructed the menu, initiated a small marketing campaign, cleaned up the property, and got a lube center located in a separate building in operation. He also helped Bangash try to obtain outside financing

for the much-needed capital improvements by putting him in touch with his banking contacts and helped to produce promotional materials to present to potential lenders. Pappas was not paid for his efforts but believed he owned 50% of the company.

Both car washes struggled. Without an infusion of capital, Pappas said it was "impossible" to turn them around. According to Pappas, Bangash did not make the needed capital improvements to the Dallas wash and failed to fund payroll and other expenses, leaving him to pay them at times. In addition, when they took possession of the Plano wash, Bangash immediately terminated the convenience store lease, which paid $5,000 monthly, and leased it to one of his other companies at a rate of $4,000 a month. Bangash's son ran the store, but Bangash never collected rent. Pappas said since there was only one electric meter, the car wash was paying the store's overhead while the store's profits went to Bangash's son.

In December, Pappas was summoned to the office of Bangash's attorney, where he was told he was doing "an awful job" and did not deserve 20% of the company. He was presented with a revised management agreement that stripped him of his ownership but offered a three-year contract as an employee. Pappas refused to sign the agreement and left the meeting. Days later, Bangash emailed him to turn over all keys, books, reports, and passwords and to stay away from both car washes or he would be trespassing. One week later, Pappas sued.

Pappas testified he never received any shares in the company. Bangash refused to transfer to him any stock in Wash Tech, would not modify the Management Agreement to reflect his 50% ownership, and denied on several occasions that he owned any interest in the company. Pappas presented tax returns for 2011–2013 and an SBA form in which Bangash represented he was the 100% owner of Wash Tech. Pappas said he relied on Bangash's representation he would give him an additional 30 percent ownership in Wash Tech when he made the assignment but believed at trial that Bangash never intended to fulfill it.

Robert Buchholtz, the attorney representing Wash Tech in the purchase of the Plano wash note, testified both parties at closing, each in front of the other, said they were 50/50 partners in the deal. He learned in December 2011 that Bangash never transferred the stock to Pappas and that Bangash took the position Pappas did not own one share in Wash Tech. Similarly, Stewart Bul with Southwest Securities, the bank holding the note on the Plano car wash, said he understood Pappas and Bangash were partners in the deal.

Mobin Mushtaq, the Wash Tech corporate representative and a relative of Bangash's, testified the corporate books show no stock transfers and he had never been instructed to issue any. At the time of trial, Wash Tech still owned the Dallas car wash but listed it for sale for $650,000 or $700,000; it was not operating. He said Wash Tech sold the Plano location for $2.5 million and paid off the $1.15 million note. The remaining proceedings were in an account controlled by the bankruptcy court. He acknowledged Pappas was not obligated to use his own funds in furtherance of the car wash businesses and said Pappas never misrepresented his financial condition. He agreed Bangash was the "finance man" and Pappas was the "car wash guy."

Bangash testified Pappas proposed going into business together because he was unhappy in his arrangement at Wash Masters. Bangash showed Pappas the Dallas car wash site, and Pappas told him it was "awesome property" and needed "some remodeling," but that Bangash should "jump on" if he could buy it for the "right price." Pappas recommended almost $1 million in improvements, but Bangash told him he could afford only the $250,000 tunnel upgrades; the other improvements, he said, would have to be done over time. According to Bangash, Pappas told him he had people "lined up" and financing for the capital improvements would not be a problem. He said he purchased the property because Pappas said it was "A plus" and that if Bangash let him do the work, he would "mimic exactly like Wash Master." He said he would not have purchased it had he known the capital improvement money was not going to be available. Bangash said he

entered the Management Agreement because of Pappas's expertise: Pappas said he knew the business and knew the banks that could finance the improvements.

After the Management Agreement was executed, Pappas asked if Bangash was interested in going in on the purchase of the Plano location. According to Bangash, Pappas told him it was a "goldmine," its equipment was in "great condition," and it could support itself and the Dallas wash. Bangash acknowledged that once Wash Tech took possession of the Plano property, he terminated the lease on the convenience store and one of his companies, New Jonathan Enterprises, took over. He said the $4,000 rent was "prepaid" because New Jonathan had paid for Wash Tech's past due taxes and title insurance. Bangash admitted he gave New Jonathan the money to lend to Wash Tech.

Over the next several months, Bangash said he put money into both car washes. In December, he noticed the business "was going down big time" and he was having to put in substantial funds to cover the day-to-day operations. Around the same time, he had a background check run on Pappas and learned he had a prior bankruptcy. He was upset and concerned this information would impact his ability to obtain financing, so he had the Management Agreement revised to remove Pappas's ownership and to offer Pappas a three-year term to manage the properties. He presented the revised agreement to Pappas, but said it was not a "take it or leave it" proposition. Pappas refused. Over the next nine days, Bangash said Pappas's "tone" changed and he then began receiving demand letters from creditors. He said Pappas refused to give him the password to the company computer and removed the company files. So, Bangash sent the letter terminating Pappas. Subsequently, he contacted Perkins, the guarantor on the $3.2 million note, to help with the operations of the Plano car wash. Bangash did not sue Perkins for the deficiency and, in fact, admitted that he testified at his deposition that he wanted to help Perkins get his property back.

Bangash testified Pappas owned 20% of Wash Tech under the Management Agreement; however, on cross examination, he admitted he had taken the position in other sworn testimony that Pappas owned nothing. He also acknowledged claiming 100% ownership in IRS and SBA forms, but said that was because the parties were in litigation and he was unsure what percentage of the company Pappas owned.

After hearing the evidence, the jury found appellants breached an oral agreement to increase Pappas's ownership in Wash Tech and committed fraud against him. (The trial court previously determined on summary judgment motion that appellants had breached the written Management Agreement.) The jury failed to find that Pappas committed fraud against Wash Tech as an inducement to enter the written Management Agreement. The jury awarded contract, fraud, and exemplary damages to Pappas, who elected to recover on his fraud claim. In a separate hearing, the trial court awarded Pappas his attorney's fees and reduced the verdict to judgment. Appellants' post-trial motions were overruled. This appeal followed.

Before turning to the merits, we address the briefing. Appellants have filed separate briefs, but Bangash has, for the most part, adopted and incorporated Wash Tech's arguments. We will identify any issue separately briefed by Bangash or briefed only by Wash Tech. Additionally, the briefs raise both "issues" and "points of error," and for clarity, we will use the nomenclature used in the briefs. We begin with the complaints regarding the sufficiency of the evidence to support the jury's findings.

In its first issue, Wash Tech asserts there was legally and factually insufficient evidence to support the jury's failure to find that Pappas committed fraud against it as an inducement to enter the written Management Agreement.[1] (Bangash has not joined this issue.)

---

[1] Wash Tech's first issue challenges the legal sufficiency of the evidence, but the body of the argument seeks a remand for a trial on liability. Consequently, giving Wash Tech every benefit, we treat his issue as also challenging the factual sufficiency of the jury's failure to find.

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it had the burden of proof, it must show the evidence establishes all vital facts as a matter of law. *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 710 (Tex. App.—Dallas 2011, pet. denied). In this instance, we must credit evidence favorable to the finding if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If there is no evidence to support the finding, we review the entire record to determine if the contrary proposition is established as a matter of law. *PopCap Games*, 350 S.W.3d at 710. We sustain the issue only if the contrary proposition is conclusively established—that is, if Wash Tech conclusively established that Pappas committed fraud. When the party also complains about the factual sufficiency of the evidence, it must show the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *PopCap Games*, 350 S.W.3d at 722. We must consider and weigh all of the evidence and set aside the verdict only if the supporting evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem.*, 46 S.W.3d at 242; *PopCap Games*, 350 S.W.3d at 722.

When conducting our review of both legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Lutterodt v. Emily Lane Owners Ass'n, Inc.*, No. 05-14-01329-CV, 2016 WL 3381919, at *2 (Tex. App.—Dallas June 16, 2016, pet. denied) (mem. op.). The jury is free to believe some, all, or none of a witness's testimony. *Lutterodt*, 2016 WL 3381919, at *2. We may not substitute our judgment for that of the fact finder's. *Id.*

Question 9 asked: "Did Pappas commit fraud against Wash Tech as an inducement to enter into the written Management Agreement?" As submitted in the charge, fraud occurs when (1) there is a false representation of a past or existing material fact, (2) the false representation is made to a person for the purpose of inducing that person to enter into a contract, and (3) the false representation is relied on by that person in entering into that contract. The question included an instruction that the fraud, if any, "must be based upon a theory that 'Pappas misrepresented that he had experience in successfully owning and operating several car washes for many years.'"

In its brief, Wash Tech asserts the only evidence in the record of Pappas's experience in owning and operating car washes "was that he was involved in a car wash partnership that 'went under' and that he was in charge of a car wash that was foreclosed upon." Evidence at trial showed Pappas was operating a successful car wash, Wash Masters, when he met Bangash, and Bangash was so impressed with the operation that he wanted to partner with Pappas on other car washes. Moreover, Pappas denied ever representing that he had any success in the car wash business other than at Wash Masters and said Bangash's only exposure to and knowledge of his experience was at Wash Master.

Wash Tech also asserts it relied on representations made by Pappas regarding "the ease" with which financing could be obtained because Pappas told him he knew banks that specialized in car wash financing and had people "lined up." Additionally, he said Pappas represented the Plano car wash "was in such good condition, that it should be able to financially carry itself and the Dallas Wash. Pappas testified he helped Bangash try to obtain outside financing by putting him in contact with his banking contacts and helped produce promotional materials to present to lenders. But, as Pappas and corporate representative Mushtaq both testified, Bangash was the "finance guy," not Pappas. Moreover, Pappas testified both car washes struggled because Bangash failed to keep his commitment to make the necessary improvements to turn them around.

–9–

Additionally, there was evidence Bangash terminated a $5,000 a month lease on a convenience store on the Plano car wash property and leased the store to one of his other companies. After that, the rent was never paid, and the car wash was expected to pay all the overhead on the store. We conclude Wash Tech has failed to show the evidence conclusively established Pappas committed fraud nor has it shown the failure to find fraud is against the great weight and preponderance of the evidence. We overrule Wash Tech's first issue.

In Wash Tech's second issue and Bangash's fourth issue, they challenge the legal and factual sufficiency of the jury's findings in Question 5 that they committed statutory fraud.

Because Pappas had the burden of proof at trial, we sustain appellants' legal sufficiency challenge to the jury's findings "if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla." *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Id*. Evidence that creates a mere surmise or suspicion of a vital fact is no evidence. *Id*. We consider the evidence in the light most favorable to the judgment, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id*. As for appellants' factual sufficiency complaint, they must show the evidence is insufficient to support the finding. We consider and weigh all the evidence, and we should set aside the judgment only if it so contrary to the overwhelming weight of the evidence as to be clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

A plaintiff may recover for statutory fraud in a transaction involving stock in a corporation. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2015). As submitted in the charge, fraud occurs when (1) there is a false representation of a past or existing material fact, (2) the false representation is made to a person for the purpose of inducing that person to enter into a contract,

and (3) the false representation is relied on by that person in entering into that contract. It also occurs when (1) a party makes a false promise to do an act, (2) the promise is material, (3) the promise is made with the intention of not fulfilling it, and (4) the promise is made to a person for the purpose of inducing that person to enter into a contract, and that person relies on the promise in entering into that contract. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2015).

Wash Tech first asserts the evidence shows any representations were made by Bangash, not Wash Tech, suggesting Wash Tech therefore cannot be held liable. But the jury was instructed that Wash Tech may have committed fraud if, but only if, a vice-principal of Wash-Tech ratified or approved the act. The charge defined vice-principal as a corporate officer, a person who has authority to employ, direct, and discharge an employee of Wash Tech, a person engaged in the performance of nondelegable or absolute duties of Wash Tech, or a person to whom Wash Tech has confided the management of the whole or a department or division of the business of Wash Tech. Wash Tech does not argue Bangash was not a vice-principal nor could it given the evidence that Bangash was president of Wash Tech and controlled Wash Tech.

Next, Wash Tech asserts that after both car washes were purchased, Bangash infused money in them to keep them afloat and Wash Tech was not required to make any capital improvements until a loan was secured. As for the "handshake deal" giving Pappas 50% ownership, Wash Tech argues Pappas's "first and only 'proposal' and 'suggestion on the arrangement' was the 20% ownership in a suggested limited partnership" with an option to acquire up to 40% ownership. Wash Tech argues that what Pappas accepted by entering into the Management Agreement was "nearly identical" to what he originally proposed and Wash Tech gave Pappas what he "bargained for" and did not fraudulently induce him into the Management Agreement. In addition to these arguments, Bangash argues Pappas agreed to a Management Agreement that gave him 20% ownership and contained a merger clause; that Pappas told Bangash

–11–

it would be better to put their agreement in writing; and that Pappas admitted at deposition that the Management Agreement applied to all their dealings.

Pappas testified Bangash represented to him that if he would operate and manage the Dallas wash, Bangash would give him a 20 percent ownership interest in Wash Tech and would finance the improvements necessary to make the car wash a success. In reliance on these representations, Pappas said he entered the Management Agreement on June 13, 2011 and began performing its terms. As for the Plano car wash, evidence showed Pappas obtained a right to purchase the defaulted bank note, secured by the car wash and a guaranty. Bangash told Pappas if he would assign his option to buy the car wash to Wash Tech, and operate and manage it similarly to the Dallas wash, Bangash would give him an additional 30 percent ownership interest in Wash Tech, which would make Pappas 50/50 owner in Wash Tech. In reliance on Bangash's representation, Pappas assigned the option and thereafter operated the car wash, but Bangash never gave him his ownership interest in Wash Tech. Pappas did not believe Bangash ever intended to fulfill his representation and the representation was false when made.

Pappas's testimony was corroborated in part by Buchholtz, the attorney who represented Wash Tech in the purchase of the note secured by the Plano car wash. Buccholtz testified that, at the closing, Pappas and Bangash each represented they were 50/50 partners in the deal. At trial, Bangash was willing to agree that Pappas owned 20% under the Management Agreement, but he acknowledged he previously took the position that Pappas owned nothing. And, in fact, Pappas admitted documentary proof to show Bangash believed Pappas owned nothing—tax returns and an SBA form in which Bangash asserted he was 100% owner in Wash Tech. We conclude this is more than a scintilla of evidence to support the jury's findings that Wash Tech and Bangash committed fraud. Moreover, appellants have not shown the evidence is so weak or the findings so

against the great weight and preponderance of the evidence that they are clearly wrong and unjust. We overrule the Wash Tech's second issue and Bangash's fourth issue.

Appellants' third issue challenges the legal sufficiency of the evidence to support the jury's findings in Question 6,[2] which asked jurors to determine damages for appellants' fraud on Pappas. The jury answered the two damage elements as follows:

1. The difference, if any, between the value of the ownership interest in Wash Tech that Pappas was promised to receive and the value of the ownership interest in Wash Tech that Pappas actually received.

   Answer: $1,157,397

2. The value of Pappas' unreimbursed out of pocket expenses.

   Answer: $40,000

Initially, we note Wash Tech's brief recites the damage questions presented in Question 4 for breach of the oral agreement, and Wash Tech cites only two cases, both regarding contract damages. Bangash's brief adopts and incorporates the argument and authorities in Wash Tech's brief. To the extent appellants complain about the contractual damages, they cannot show reversible error because Pappas elected to recover on his fraud claim. *See* TEX. R. APP. P. 44.1(a). Assuming appellants intend to challenge the fraud damage findings, however, we conclude there was sufficient evidence to support them.

Generally, a property owner is qualified to testify to the value of his property even if he is not an expert. *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.,* 337 S.W.3d 846, 852–53 (Tex. 2011). This rule is based "on the presumption that an owner is familiar with his property and its value," and it "is an exception to the requirement that a witness must otherwise establish his qualifications to express an opinion on values." *Natural Gas Pipeline Co. of Am. V.*

---

[2] Bangash's issue states he is challenging the legal and factual sufficiency of the evidence but the body of his brief does not. He does not include any standard of review but asks us to reverse and render a take-nothing judgment. Accordingly, we treat his issue as raising only the legal sufficiency of the evidence.

*Justiss*, 397 S.W.3d 150, 157 (Tex. 2012). To testify on value, the owner must provide the factual basis on which his opinion rests, although this burden is not particularly onerous in light of the resources available today. *Id*. at 159. Evidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim. But the value must be substantiated; a naked assertion of "market value" is not enough. *Id*.

Pappas valued his 50% interest in Wash Tech at $1,157,397 by considering its assets minus its liabilities. The assets were the Dallas car wash and the $3.2 million promissory note. Pappas testified the fair market value of the company on June 13, 2011—the date he was induced to enter the Management Agreement and should have received 20% ownership in the company—was $181,250. At that time, the company owned the Dallas car wash, which was purchased on June 3 for $725,000. Pappas subtracted the amount owed on the car wash ($543,750) from the purchase price to reach the fair market value.

Seventeen days later, on June 30, Wash Tech purchased the $3.2 million note that was secured by the Plano car wash and a separate guaranty. Pappas was induced to assign the note to Wash Tech in exchange for Bangash's promise to increase Pappas's ownership to 50%. The note was purchased for $1.65 million; $500,000 of the purchase price was paid, leaving a balance owing of $1.15 million. Using the same equation for the Plano wash, Pappas subtracted the amount owed, $1.15 million, from the $3.2 million note purchased, for a fair market value of $2,133,545. Fifty percent of the two values added together is $1,157,397.

Appellants complain the "asset note" was never introduced into evidence and no evidence shows the "solvency of the maker of the note or the identity or solvency of any guarantors," the marketability of the note, its present value and any unpaid principal. But appellants cite no case requiring such proof nor have we found one. The evidence before the jury established the face amount of the promissory note as $3,283,545 when it was purchased. What appellants are

proposing is that, in addition to presenting proof of the amount of the promissory note, Pappas needed to disprove insolvency of the maker and guarantor to establish the note's value. We simply cannot agree.

To the extent Bangash argues the appraisal was inadmissible because the business record predicate was not satisfied, this issue is inadequately briefed. Regardless, in addition to the appraisal itself, three witnesses (Pappas, Buccholtz, and Mushtaq) testified without objection that the property securing the note was appraised at $2.5 million; thus, any error is rendered harmless. *See Volkswagen of Am. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (explaining general rule that error in admission of evidence is deemed harmless and is waived if objecting party subsequently permits same or similar evidence to be introduced without objection).

As for the value of unreimbursed out of pocket expenses, Pappas testified he put $40,000 into the closing of Wash Tech's acquisition of the $3.2 million bank note. He told the jury he was never reimbursed for this amount. Appellants argue Bangash delivered a $40,000 check to Pappas with the notation, "Repayment of Expenses for Coit," referring to the Plano car wash; thus, they contend the evidence shows Pappas was reimbursed. But Pappas explained the $40,000 check was for other expenses he paid on the Plano car wash, not the money he put into the closing. We conclude there is more than a scintillas of evidence to support the jury's damage findings. We overrule appellants' third issue.

In their fifth point of error, appellants challenge the award of attorney's fees. Their entire briefing on this issue reads as follows:

> Pappas elected to recover on his fraud claim under the Final Judgment. The issue of attorney's fees were submitted by agreement to the trial court. Under his fraud claim, Pappas submitted the Second Amended Affidavit of C. Gregory Shamoun which stated that $688,696.50 was a reasonable attorney's fee for fees at the trial level regarding this claim. Under the Final Judgment, the trial court awarded $780,061.72 in attorneys' fees connection [sic] with Pappas' statutory fraud claim. Accordingly, the trial court erred in awarding an additional $91,365.22 more than the evidence showed.

–15–

(Record citations omitted.)

An appellant's failure to cite legal authority or to provide substantive analysis of a legal issue results in waiver of a complaint. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). Here, appellants' issue is unsupported by any legal authority and is therefore inadequately briefed. Regardless, in addition to Shamoun's affidavit, Pappas presented the affidavit and billing records of two other attorneys that represented him. Appellants' argument ignores this evidence. They do not challenge the amounts stated in these records or the work done. Considering the amounts presented in the documents, together with Shamoun's affidavit, we conclude appellants' complaint is without merit. We overrule the fifth point of error.

Appellants' remaining issues address pre-trial summary judgment rulings and charge complaints. In their first point of error, appellants argue the trial court erred by granting, in part, Pappas's no-evidence motion for summary judgment on their common-law fraud claim rather than entirely denying the motion. In their second point of error, they contend the trial court erred by submitting a limiting instruction based on the summary judgment ruling.

In their First Amended Counterclaim, appellants sued Pappas for common law fraud. In the factual background, which was referenced within the fraud cause of action, appellants alleged Pappas misrepresented he had a long history of successfully operating car wash businesses with the intent to induce them into entering the Management Agreement. Three years after the lawsuit was filed, Pappas filed a no-evidence motion for summary judgment, arguing in part that there was no evidence Pappas made a material misrepresentation to appellants.

Appellants responded to the no-evidence motion with Bangash's affidavit and deposition excerpts that Pappas made material misrepresentations to Bangash with the intent they be repeated to deceive Wash Tech into entering the Management Agreement. Appellants "[s]pecifically" identified the following representations:

–16–

- [Pappas] misrepresented that he had experience in **successfully** owning and operating **several** car washes for **many** years. In reality, at the time of the statement, at least two car washes that he had operated in had to file for bankruptcy and he had been forced to file for personal bankruptcy in late 2009 and only one of his car washes had not failed;

- [Pappas] misrepresented that he would make the Counter-Plaintiff a lot of money if they opened up a car wash together. In reality, the Counter-Plaintiffs would lose a substantial amount of money in the Plano Car Wash.

- [Pappas] misrepresented that Wash Technologies would not need supplemental operating income after six months of operation. In reality, Counter-Plaintiffs are still subsidizing the costs of operating the car wash, over three years after it opened.

- [Pappas] misrepresented that the purchase of the Plano Car Wash is a "home run." In reality, three years after its opening and approximately $90,000.00 worth of capital improvements and the car washes are still operating at a net loss; and

- [Pappas] misrepresented that, for the purchase price of approximately $725,000, the Dallas Car Wash would make money. However, the Dallas Car Wash never earned a profit.

(Emphasis in original.)

The trial court granted the no-evidence motion in part and denied it in part. In its order, the trial court ruled that the fraud claims based on misrepresentations (2) – (5) failed as a matter of law and rendered a take-nothing judgment on those claims. The trial ordered the "only remaining fraud claim" that appellants could "assert and prosecute" was based on Pappas's alleged misrepresentation that he had experience in successfully owning and operating several car washes for many years.

On appeal, appellants argue that on a no-evidence motion for summary judgment, a trial court only has two options: it can grant the motion or it can deny the motion, but it cannot do as the trial court did here and grant the motion in part and deny it in part. They argue that given their "general allegations of fraud" in their first amended counterclaim and because they put on some

evidence of *a* misrepresentation, the motion should have been denied in total.[3] Appellants argue the trial court erred in its order by specifying "by phrase" what fraud claim they could prosecute at trial and this error was the basis for "further error when the trial court used such phrased word" as limiting the fraud claim presented to the jury.

Even if we were to assume appellants are correct on their view of the limits on a trial court's ruling on a no-evidence summary judgment motion, they have not shown how the error led to the rendition of an improper verdict in this case. *See* TEX. R. APP. P. 44.1(a). They do not argue the trial court's substantive ruling on the four other statements was incorrect; accordingly, they have not shown they could have obtained any recovery based on those statements. Nor do appellants argue they were denied the ability to put on any evidence at trial or to present any other theory at trial. The charge did contain an instruction limiting the fraud claim in Question 9 to the theory that "Pappas misrepresented that he had experience in successfully owning and operating several car washes for many years." But appellants did not object to the inclusion of the limiting instruction. *See Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 919–20 (Tex. 2015) (explaining party preserves jury charge error by making trial court aware of complaint, timely and plainly, and obtaining ruling). To the extent appellants suggest they asked the trial court to submit a global fraud question and the trial court refused, we have reviewed the record and it does not support their assertion. Certainly, there is nothing in the record to indicate appellants plainly made the trial court aware they wanted a question unburdened by the limiting instruction. Because appellants have not shown the trial court's ruling to grant a no-evidence summary judgment on four of the five alleged statements led to an improper judgment in this case, we overrule the first and second points of error.

---

[3] Although not necessary to the disposition of this issue, we do not agree that appellants made a "general" fraud allegation. In the factual background of their pleading, the only misrepresentation identified was the one related to Pappas's experience. The factual background section was followed by the causes of action. In their section setting out their fraud cause of action, appellants began by stating they "repeat[ed] and reassert[ed] the allegations contained in the paragraph above and below."

In their third point of error, appellants argue the trial court erred in granting Pappas's motion for partial traditional summary judgment on his claim for breach of the written Management Agreement. They assert they raised a fact issue on the affirmative defense of prior material breach. In their brief, appellants cite us to their summary judgment response, but do not otherwise identify the particular evidence that raises the fact issue or analyze any evidence in the context of the applicable law and describe why it raised a fact issue. Consequently, we conclude this issue is inadequately briefed. *See* TEX. R. APP. P. 38.1 Moreover, we note Pappas elected to recover under his statutory fraud theory; thus, any error regarding appellants' breach of the Management Agreement did not lead to an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). We overrule the third point of error.

In their fourth point of error, briefed in four sentences, appellants contend the trial court erred by failing to submit questions and instructions on their affirmative defense of Pappas's prior material breach, asserting facts were adduced at trial "in addition to the numerous questions of fact" raised on summary judgment. They assert questions and instructions regarding this issue were refused by the trial court. They direct us to their written request for a question that asked whether Pappas breached the management agreement (as opposed to appellants in the above issue) followed by two conditional questions with instructions regarding prior material breach. A trial court is required to submit questions and instructions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). Appellant has not set out any evidence or cited any legal authority in support of their issue. Accordingly, we conclude the fourth point of error is inadequately briefed. *See* TEX. R. APP. P. 38.1.

In their sixth point of error, appellants assert the trial court erred by instructing the jury in Question 1 to find the fair market value of Wash Tech on June 13, 2011. They assert this date is irrelevant to Pappas's damages.

As stated previously, the trial court granted summary judgment on Pappas's claim for breach of the written Management Agreement executed on June 13, 2011 and reserved the issue of damages for trial. Question 1 is the damage question submitted for the breach of the written Management Agreement. Pappas elected to recover on his statutory fraud claim. Thus, error, if any, in submitting this damage question for breach of contract did not lead to an improper judgment. *See* TEX. R. APP. P. 44.1(a). We overrule the sixth point of error.

We affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

160633F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WASH TECHNOLOGIES OF AMERICA
CORPORATION, AND JON K.
BANGASH, Appellants

No. 05-16-00633-CV      V.

JOHN T. PAPPAS, Appellee

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-16090.
Opinion delivered by Justice Francis;
Justices Evans and Boatright participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee JOHN T. PAPPAS recover his costs of this appeal from appellants WASH TECHNOLOGIES OF AMERICA CORPORATION AND JON K. BANGASH.

Judgment entered this 6th day of February, 2018.